AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISIS LOCATED AT: **1436 WIDEFIELD LANE, ST. LOUIS, MISSOURI 63138** MORE FULLY DESCRIBED IN ATTACHMENT A. | Case No. 4:20 MJ 6159 PLC<br>*Signed and Submitted to the Court for filing by reliable electronic means*<br>**FILED UNDER SEAL** |

## APPLICATION FOR A SEARCH WARRANT

I, ___Jarrett Neff___, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**1436 WIDEFIELD LANE, ST. LOUIS, MISSOURI 63138** MORE FULLY DESCRIBED IN ATTACHMENT A.

located in the ___EASTERN___ District of ___MISSOURI___, there is now concealed

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ✓ evidence of a crime;
- ✓ contraband, fruits of crime, or other items illegally possessed;
- ✓ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, USC Section 841(a)(1), 846 | Conspiracy to possess with intent to distribute controlled substances |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓  Continued on the attached sheet.
☐  Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SA *[signature]*
*Applicant's signature*
Jarrett Neff, Special Agent, DEA

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedures 4.1 and 41 on this ___15th___ day of July, 2020.

Date: ___July 15, 2020___

*Patricia L. Cohen*
*Judge's signature*

City and State: ___St. Louis, MO___

Honorable Patricia L. Cohen, U.S. Magistrate Judge
*Printed name and title*
AUSA:  Derek J. Wiseman

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jarrett Neff, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Drug Enforcement Administration, and have reason to believe that on the premises known as **1436 WIDEFIELD LANE, ST. LOUIS, MISSOURI 63138, FURTHER DESCRIBED AS A TAN SIDING SINGLE FAMILY RESIDENCE WITH A WHITE AWNING OVER THE FRONT DOOR, WHITE TRIM AROUND THE WINDOWS AND DOOR, WHITE GUTTERS AND SOFFET, AND A WHITE GARAGE DOOR**, (hereinafter the "Target Premises") further described in Attachment A, for the things described in Attachment B.

2. I, Jarrett K. Neff am an investigative and law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 206(7) and am empowered by law to conduct investigations of an to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been a Special Agent with the Drug Enforcement Administration (DEA) since March 2017 and am currently assigned to an Enforcement Group within the Fairview Heights Resident Office, within the St. Louis Field Division.  Prior to my DEA employment as a Special Agent I was a sworn police officer with the Cahokia Police Department and St. Louis Metropolitan Police Department for approximately 7 1/2 years. During the course of my law enforcement career I have participated in numerous investigations involving controlled substances. I have conducted investigations in variety with regards to the trafficking and distribution of illegal narcotics. These investigations have led to the seizure of narcotics, weapons, and United States Currency. I later presented these cases to State and Federal courts for prosecution.  I have further participated in numerous drug related training courses throughout my law enforcement career, including but not limited to the Drug Enforcement Basic Agent Academy. I am familiar with and

have used methods of investigations which included electronic surveillance, interviews of suspects and witnesses, search warrants, arrest warrants, and the handling of confidential informants.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. Sections 841(a)(1) and 846 have been committed by Carl Love (LOVE) along with other other persons known and unknown at this time. There is also probable cause to search the property described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## LOCATION TO BE SEARCHED

5. This affidavit is submitted in support of an application for the issuance of federal search warrants for the following location, which is located in the Eastern District of Missouri::

   a. **1436 WIDEFIELD LANE, ST. LOUIS, MISSOURI 63138, FURTHER DESCRIBED AS A TAN SIDING SINGLE FAMILY RESIDENCE WITH A WHITE AWNING OVER THE FRONT DOOR, WHITE TRIM AROUND THE WINDOWS AND DOOR, WHITE GUTTERS AND SOFFET, AND A WHITE GARAGE DOOR.** The Premises is described in Attachment A.

## PROBABLE CAUSE

6. In late June, 2020, a Cahokia Police Department CS-20-004 (CS) provided information to investigators, including the affiant, regarding the drug distribution of Carl G. LOVE, in St. Louis, Missouri. The CS was arrested for Unlawful Possession with Intent to

Distribute Methamphetamine in May of 2020. The CS agreed to cooperate with investigators for judicial consideration on the aforementioned charge and has not been financially compensated. The CS has been arrested on prior occasions for stealing, possession of methamphetamine, aggravated battery, trespassing, obtaining substance by fraud, possession of a controlled substance, obstructing identification, driving under the influence of alcohol, and driving while license suspended/revoked. The information provided by the CS has been corroborated by surveillance, controlled purchases of crystal methamphetamine, and recorded telephone conversations. To date, investigators, including the affiant, have not found information provided by the CS to be false or misleading in this investigation. For these reasons, I consider the CS to be reliable.

7.   The CS advised investigators, including the affiant, that LOVE is selling multiple ounces of crystal methamphetamine daily within the Eastern District of Missouri.  The CS further advised he/she has purchased in the past month, ounce quantities amounts of crystal methamphetamine from LOVE, ranging in price from $800.00 to $900.00 per ounce. The CS stated he/she would call LOVE via telephone (314-560-5389) and arrange the purchase/amount of crystal methamphetamine, and LOVE would direct the CS where to meet to complete the narcotics transaction. The CS stated the drug transactions usually occur off of Bellefontaine Road near I-270, and—more often than not—the narcotics transactions are completed at a liquor store parking lot located at 11048 Larimore Road #2002, St. Louis, MO. The CS further advised investigators, including the affiant, that LOVE lives in close proximity to the aforementioned liquor store, and that the CS has been to LOVE's residence on prior occasions to purchase crystal methamphetamine. During this particular conversation, SA Jarrett Neff (the affiant), as witnessed by TFO Kevin Bauer and TFO Kyle Puckett, provided the CS with a photograph of the **Target Premises**, which the CS immediately identified as the residence where he/she had purchased crystal methamphetamine from LOVE on prior occasions.

8. After learning the above information, on July 10, 2020, investigators, including the affiant, met with the CS for the purpose of completing a controlled purchase of crystal methamphetamine from LOVE. After meeting with investigators, the CS completed a recorded telephone call to LOVE, during which LOVE agreed to meet the CS at the "liquor store" (11048 Larimore Road #2002, St. Louis, MO) to sell the CS an ounce of crystal methamphetamine for $900.00 USC. The affiant listened to this recorded telephone call between the CS and LOVE. After completing the telephone call, TFO Kyle Puckett searched the CS for items of contraband, which was met with negative results. At this time, TFO Gregory Hosp activated and provided the CS with numerous recording devices along with $800.00 recorded O.A.F. At this time, SA Winfred Strickland, acting in an undercover capacity (UC), drove the CS from the meet location to the Larimore Food and Liquor, where the transaction was set to transpire. It should be noted, the CS and SA Strickland where under constant audio and visual surveillance during the entire recorded narcotics transaction.

9. At approximately 1:50 P.M., a grey Chevrolet truck pulled onto the parking lot bearing MO #2TC042 (2006 Chevy Silverado registration returned to Gary Ingram). The CS advised SA Strickland that the passenger in the Chevrolet truck was in fact LOVE. The CS exited the UC vehicle and approached LOVE, who was walking towards the front of the business. After the CS approached LOVE, the narcotics transaction occurred while standing in front of the business. During the narcotics transaction, CS passed LOVE the O.A.F., and LOVE provided the CS with the a plastic baggie containing suspected methamphetamine.[1] The CS then walked back

---

[1] The suspected methamphetamine was subsequently sent to a Drug Enforcement Administration laboratory for analysis. At this time, investigators are still awaiting the lab's analysis. The affiant—and the other members of the investigative team—have seized substances that have tested positive for methamphetamine throughout their careers as drug trafficking investigators. The suspected methamphetamine that was seized in this case is consistent in color and appearance with the numerous amount of methamphetamine seized by investigators during the course of their careers.

4

to the UC vehicle and gave the plastic bag containing the suspected methamphetamine to SA Strickland. SA Strickland witnessed the aforementioned narcotics transaction, and reported what he witnessed to the affiant. It should be noted, the affiant's later review of the audio/video recording devices confirmed what SA Strickland was able to see from his position in the parking lot. The recording devices, which were reviewed by the affiant, also provided an additional confirmation that LOVE was in fact the person who sold the narcotics to the CS. Upon completion of the narcotics transaction, TFO Hosp and TFO Puckett followed SA Strickland and the CS back to the undisclosed meet location, while other investigators with the Fairview Heights Resident Office, including the affiant, continued surveillance of LOVE.

10.     As investigators, including the affiant, continued surveillance of LOVE, they followed LOVE directly to the **Target Premises,** where LOVE exited the truck and later walked to the **Target Premises,** and sat on the front porch. It should be noted that an open source database, searched by the affiant, revealed that LOVE had previously listed the **Target Premises** as a previous address. At this time, investigators terminated surveillance.

11.     On July 14, 2020, investigators, including the affiant, again met with the CS for the purpose of completing a second controlled purchase of crystal methamphetamine from LOVE. After meeting with investigators, the CS completed recorded telephone calls to LOVE, where LOVE agreed to meet the CS at the "liquor store" (11048 Larimore Road #2002, St. Louis, MO) to sell the CS two ounces of crystal methamphetamine for $1,700.00 USC. The affiant listened to this recorded call between LOVE and the CS. After completing the telephone call, SA Jarrett Neff (the affiant) searched the CS for items of contraband, which was met with negative results. At this time, TFO Kevin Bauer activated and provided the CS with numerous recording devices along with $1,700.00 recorded O.A.F. TFO Kevin Bauer, acting in an undercover capacity (UC), drove the CS from the meet location to the Larimore Food and Liquor, where the transaction was set to

transpire. It should be noted, the CS and TFO Bauer where under constant audio and visual surveillance during the entire narcotics transaction.

12. Simultaneously, while SA Neff (the affiant), TFO Bauer, and TFO Puckett were meeting with the CS, TFO Hosp, SA Ryan Bandy, and SA Ayla Horlick established surveillance of the **Target Premises**. While conducting surveillance, TFO Hosp observed LOVE, along with a juvenile male, exit the front door of the **Target Premises,** enter inside a grey van bearing Missroui Registration HN6J4X, and depart the **Target Premises**. Investigators continued surveillance of LOVE, until he (LOVE) arrived at the purposed meet location. While traveling to the purposed meet location, LOVE did not meet with anyone, or stop at any additional locations. This information was conveyed by investigators to SA Neff (the affiant).

13. After both the CS and LOVE arrived at the meet location, SA Neff (the affiant) observed the CS exit the UC vehicle and enter inside the right rear passenger door of LOVE's van. After approximately two minutes passed, SA Neff (the affiant) observed the CS exit the van and enter back inside the UC vehicle. At this time, TFO Bauer advised the affiant that the CS obtained the crystal methamphetamine and they were departing the area. The CS later advised investigators that while inside the van, he/she handed LOVE the O.A.F., and LOVE handed him/her the crystal methamphetamine. The CS further stated LOVE advised that he (LOVE) had an additional quantity of crystal methamphetamine, when the CS needed more. It should be noted that the affiant's later review of the audio/video recording devices confirmed the CS details of the transaction along with confirming that LOVE was in fact the person who sold the narcotics to the CS. Upon completion of the narcotics transaction SA Neff and TFO Puckett followed TFO Bauer and the CS back to the undisclosed meet location.

14. After each controlled purchase, the CS met with investigators, including the affiant, and gave investigators the suspected crystal methamphetamine and recording devices. The CS's person was searched by investigators for contraband, with negative results.

15. Based on the above information, it is believed that LOVE will continue distributing crystal methamphetamine within the Eastern District of Missouri. It is anticipated that LOVE, will continue to use the **Target Premises** to commit further violations of 21 U.S.C. §§ 841(a)(1) and 846.

16. As part of my experience and training and that of other law enforcement officers participating in the investigation, we have accumulated information and training in the areas of narcotics based economic crime. I have had extensive experience, as have other members of the investigating team, in interviewing defendants, witnesses, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking. Based upon my and the investigating team's experience and our participation in other pending and completed controlled substances and/or financial investigations involving ongoing, extensive distribution conspiracies involving large amounts of controlled substances and money, I am informed of the following:

    a. It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

    b. Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of controlled substances. These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

    c. Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to

      the transportation, ordering, sale and distribution of controlled substances. Drug traffickers commonly "front" (provide drugs on consignment) controlled substances to their clients. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

d.     Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with persons known to traffic in controlled substances or to facilitate such trafficking. These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

e.     Drug traffickers take or cause to be taken photographs of them, their associates, their property, cash and currency, firearms, and controlled substances. These traffickers frequently maintain these photographs in their residence or other buildings under their control.

f.     Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property

        utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

g.    When drug traffickers amass large proceeds from the sale of controlled substances they attempt to legitimize these profits. I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts. They maintain record of these transactions in their residence or other buildings under their control.

h.    It is common for drug traffickers to travel to major distribution centers, such as Texas, California and/or Mexico to purchase controlled substances and/or to arrange for its distribution elsewhere in the United States. After purchasing controlled substances, these drug traffickers will transport or cause to be transported, controlled substances to the areas in which they will distribute the controlled substances. The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers. Records of travel are frequently kept in their residence or other buildings under their control.

i.    Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in controlled substances prosecutions.

j.    Drug traffickers frequently possess firearms and/or other weapons in their residence or other buildings under their control to protect their cocaine and/or United States currency.

9

## CONCLUSION

17. Based on the foregoing I submit that this affidavit supports probable cause for a warrant to search the **Target Premises** described in Attachment A and seize the items described in Attachment B.

18. I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Jarrett K. Neff
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me by reliable electronic means, pursuant to Federal Rule of Criminal Procedure 4.1 on _____,2020

*Patricia L. Cohen*
The Honorable Patricia L. Cohen
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be searched*

The property to be searched is in the premises located at: **1436 WIDEFIELD LANE, ST. LOUIS, MISSOURI 63138**, FURTHER DESCRIBED AS A TAN SIDING SINGLE FAMILY RESIDENCE WITH A WHITE AWNING OVER THE FRONT DOOR, WHITE TRIM AROUND THE WINDOWS AND DOOR, WHITE GUTTERS AND SOFFET, AND A WHITE GARAGE DOOR.



## ATTACHMENT B

*Property to be seized*

1. All records and information relating violations of Title 21 U.S.C. Sections 841(a)(1) and 846 that constitutes fruits, evidence and instrumentalities of violations those violations involving Carl Love (LOVE) including:

   a. Controlled substances;

   b. Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

   c. Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

   d. Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service;

   e. Digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room and/or digital communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

   f. Photographs, in particular photographs of co-conspirators, assets and/or controlled substances;

   g. United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution

of controlled substances or which are proceeds from the distribution of controlled substances;

h. Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

i. Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere;

j. Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys; and

k. Firearms and/or weapons.